# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CELEBRATE WINDSOR, INC., d/b/a SUMMERWIND PERFORMING ARTS CENTER, | : : : : | NO. 3:05CV282 (MRK) |
| Plaintiff, | : : | |
| v. | : : | |
| HARLEYSVILLE WORCESTER INSURANCE COMPANY, | : : : | |
| Defendant. | : : | |

## MEMORANDUM OF DECISION

In this diversity action, Plaintiff Celebrate Windsor, Inc., d/b/a SummerWind Performing Arts Center ("SummerWind"), a non-profit community arts organization based in Windsor, Connecticut, sues its insurer, Defendant Harleysville Worcester Insurance Company ("Harleysville"), to recover under a commercial property insurance policy issued by Harleysville. SummerWind made a claim on its insurance policy because in February, 2003, a substantial portion of the canopy covering SummerWind's unique tent-like performing arts center developed tears and collapsed under the weight of accumulated ice and snow. While there continues to be some question regarding the precise cause of the damage to SummerWind's facility, there is no question in this case that the damage is covered under the Harleysville policy. Instead, this dispute involves the amount that SummerWind is entitled to recover under the policy for its loss. In addition, SummerWind asserts that the manner in which Harleysville handled SummerWind's claim breached its implied covenant of good faith and fair dealing. The Court held a bench trial on SummerWind's claims on January 17-

19, 23 and 24, 2006 and heard final arguments on February 14, 2006.[1]  In accordance with Rule 52

of the *Federal Rules of Civil Procedure*, the Court makes the following findings of fact and

conclusions of law.

## I.

**SummerWind's Performing Arts Center.**  SummerWind was founded in March 2001

primarily to provide summer concerts and other cultural events in a relaxed, family-oriented setting

at its performing arts center in rural Windsor, Connecticut.  Before constructing the performing arts

center in 2002, the Board of Directors of SummerWind considered many types of structures.

Ultimately, the Board selected a design by Birdair, Inc., that utilizes a 17,500 square foot canopy

reminiscent of a circus tent that is supported by long poles (or masts) and is open on all sides.  The

canopy, a tensile strength, custom-manufactured membrane using a Kevlar fabric that is proprietary

to Birdair, affords protection from the rain and sun for performers and provides cover for

approximately 1500 seats.  In good weather, an additional 2500 patrons can stretch out under the sun

or the summer stars on a lawn that slopes gently upward from the canopy area forming an

amphitheater of sorts.

Birdair completed the design, manufacture, construction, and installation of the canopy

structure in June 2002.  Originally, the canopy was designed to be 70 feet in height, but the height

of the structure had to be reduced because of objections from the owner of the property on which the

---

[1]   In addition to their Joint Trial Memorandum [doc. # 38], which contained detailed proposed findings of fact and conclusions of law, the parties were permitted to file several supplemental briefs.  *See* Harleysville's Bench Memo Re: Scope of Replacement Compensable Under Policy [doc. # 51]; SummerWind's Post-Trial Memorandum [doc. # 59]; Harleysville's Post-Trial Brief [doc. # 60]; SummerWind's Supplemental Post-Trial Memorandum [doc. # 63] and Harleysville's Post-Trial Brief Re. Consequential Damages [doc. # 64].

performing arts center is situated.  Consequently, Birdair lowered the masts and flattened out the membrane to a maximum height of about 40 feet.  The membrane is stretched taut and held in place by its own tension, by numerous masts, anchors, plates and steel cables, and by substantial underground concrete footings that act as huge (about half a million pounds each) counterweights. Despite the lowering of the canopy, the newly constructed performing arts center was large, imposing, and impressive, and the canopy quickly became SummerWind's signature or symbol, widely used in all of its brochures and advertisements.

The original contract price for the Birdair canopy structure was $679,255.  Defendant's Exhibit 520.  That price included engineering, design, steelwork, cables, masts and the membrane itself, but it did not include concrete and other foundation and site work.  The total cost of SummerWind's performing arts center was approximately $1.2 million, $350,000 of which came from the Town of Windsor, $350,000 from the State and the balance from loans, grants, and fund-raising.  However, because the project came in over budget, SummerWind did not have sufficient funds to pay Birdair all that it was due.  Therefore, SummerWind owed Birdair about $250,000 following completion of the arts center.  SummerWind took the position that it was not responsible for some or all of that amount because Birdair was the cause of the cost overruns.

Summer 2002 was SummerWind's first season.  The season began in the third week of June and ended the first week in September.  A combination of regional and national talent appeared at various concerts during the summer.  Audiences and the musicians appeared to like the site, and the acoustics and canopy worked well.   SummerWind considered its first season an artistic success, though it was not a financial success.  As then-Executive Director Steven McKay testified, SummerWind's first season was an "artistic sensation [but] a financial flop."  Ticket sales were

below expectations, and SummerWind lost approximately $300,000, though first season losses are not atypical of start-up arts organizations.  Defendant's Exhibit 501.  SummerWind's Board and staff spent the fall of 2002 attending to finances (it was in default under one of its lines of credit and was, by all accounts, in a difficult financial condition), planning for the summer 2003 season, pursuing sponsors, and revamping the talent mix it expected to use the following summer.  By February of 2003, SummerWind had already booked most of the talent for the 2003 season.

SummerWind's  canopy was intended to be a permanent structure so the membrane was not taken down for the winter.  On February 18, 2003, John Berkey, then SummerWind's Development Director and later its Executive Director, visited the site to take some photographs of the canopy in winter for promotional brochures.  Connecticut had recently been the recipient of approximately 15 inches of snow, and Mr. Berkey expected to capture the canopy – SummerWind's symbol – in the snow.  To his dismay, he discovered that the canopy membrane was severely torn, that it had lost tension and collapsed in places, and that numerous brackets and plates had buckled, although all of the masts were still standing. The canopy consists of two large pieces of fabric that have a welded seam.  Mr. Berkey's photographs from February 18, 2003, which were admitted as evidence, show that the rear portion of the canopy – that which covers the stage and is furthest from the lawn — had ripped, separated along the seam from the other portion of the canopy, and collapsed, while the front section of the canopy – that which covers patrons and is closest to the lawn – was not ripped and was still supported on its masts.  SummerWind immediately notified Harleysville and Birdair of the damage.

**The Harleysville Insurance Policy**.      Douglas Kerr, an experienced insurance agent, was a member of SummerWind's Board from its inception and was SummerWind's Treasurer through

4

the fall of 2004.  Designated by the Board to deal with SummerWind's insurance needs and to obtain necessary insurance coverage, Mr. Kerr arranged to obtain a commercial property insurance policy from Harleysville.  The policy included Building Property Coverage of $800,000, Personal Property Coverage of $150,000, and Extra Expense Coverage of $100,000.  SummerWind decided not to purchase business interruption coverage, but it did purchase optional replacement cost coverage. The policy, which has a $5,000 deductible, is an all-risk policy that insured SummerWind's performance structure subject to the terms and conditions of the policy.  The policy term was from June 21, 2002 through June 21, 2003, and SummerWind duly paid the $4,400 premium to Harleysville.

The policy was included as part of Plaintiff's Exhibit 1.  A number of its provisions are relevant to the current dispute and to an understanding of the manner in which both parties responded to SummerWind's loss.  The Building and Personal Property policy provides that Harleysville will "pay for direct physical loss of or damage to" property covered by the policy in the event of a covered loss. Plaintiff's Exhibit 1, Building and Personal Property Coverage Form, at 1. The "Loss Payment" portion of the policy form provides that in the event of a covered loss, Harleysville "will either: (1) Pay the value of the lost or damaged property; (2) Pay the cost of repairing or replacing the lost or damaged property subject to b. below; (3) Take all or any part of the property at an agreed or appraised value; or (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.  *Id.* at 8. However, the Building and Personal Property Coverage is subject to a key limitation, specified in the above-referenced subsection "b": "The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property." *Id.* at 9.

5

SummerWind also purchased Optional Replacement Cost Coverage. This coverage is also limited in a critical fashion, providing that Harleysville will not pay on a replacement cost basis for any loss or damage "(1) [u]ntil the lost or damaged property is actually repaired or replaced; and (2) [u]nless the repairs or replacement are made a soon as reasonably possible after the loss or damage." *Id.* at 12-13. The provision also goes on to state:

> [Harleysville] will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:
>
> > (1) the Limit of Insurance applicable to the lost or damage property
> > (2) The cost to replace the lost or damaged property with other property:
> > > (a) Of comparable material and quality; and
> > > (b) Used for the same purpose; or
> > (3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

*Id.* Like subsection b of the Building and Personal Property Coverage, subsection f of the Optional Replacement Coverage provides: "The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property." *Id.*

Purchasers of Replacement Cost Coverage, like SummerWind, also benefit from provisions of the policy providing "Additional Coverage." The Additional Coverage, which is described in the policy form under the heading "Increased Cost of Construction," states that Harleysville "will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of the property," subject to a number of limitations. *Id.* at 4. As is relevant here, the Additional Coverage provides that Harleysville "will not pay any costs due to an ordinance or law that: (a) You were required to comply with before the loss, even when the building was undamaged; and (b) You failed to comply with." *Id.* Furthermore,

"the most [Harleysville] will pay under this Additional Coverage for each described building insured . . . is $10,000 or 5% of the Limit of Insurance applicable to the building, whichever is less."  Since 5% of the limit of insurance SummerWind purchased ($800,000) is $40,000, SummerWind's Additional Coverage for the increased costs of complying with ordinances, even when applicable, was limited to $10,000.  The Additional Coverage also provided that Harleysville would not pay for the increased cost of construction until the property was actually repaired or replaced and only so long as repairs or replacement are made "as soon as reasonably possible after the loss or damage, not to exceed two years."  *Id.* at 5.

SummerWind also purchased $100,000 of Extra Expense Coverage, which provides for necessary expenses incurred "during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage," in order "a. To avoid or minimize the 'suspension' of business and to continue 'operations,' " "[t]o minimize the 'suspension' of business if you cannot continue 'operations;' or . . . [t]o repair or replace any property." Extra Expense Coverage Form, at 1.  The "period of restoration" begins on the date that the damage is incurred and ends on the earlier of "(1) [t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) [t]he date when business is resumed at a new permanent location."  Furthermore, the restoration period  "does not include any increased period required due to the enforcement of any ordinance or law that . . . [r]egulates the construction, use or repair, or requires the tearing down of any property . . . ." *Id.* at 3.

Further limitations on coverage are set out in the Causes of Loss – Special Form, which states that, regardless of any other cause or event that contributes to the loss, Harleysville will not pay for loss or damage caused directly or indirectly by the "enforcement of any ordinance or law: . . .

7

[r]egulating the construction, use or repair of any property."  Causes of Loss – Special Form, at 1.
This exclusion applies regardless whether increased costs result from compliance with an ordinance
or law "in the course of construction, repair, renovation, remodeling or demolition of property." *Id.*
Harleysville is also excused from paying for loss or damage attributable to "[f]aulty, inadequate or
defective: . . . [d]esign, specifications, workmanship, repair, construction, renovation, remodeling,
grading, compaction . . . [or] [m]aterials used in repair, construction, renovation or remodeling." *Id.*
at 3.

Having recited the major provisions of the coverage and its limitations, the Court notes that
the Building and Personal Property Form also provides a method for resolving disputes about
coverage without resorting to the courts. In a Section entitled "Loss Payment," the Building and
Personal Property Form provides that Harleysville will pay for covered loss or damage within 30
days of receiving a sworn proof of loss, and provided that "[w]e have reached agreement with you
on the amount of loss" *or* an "appraisal award has been made." *Id.* at 9. The appraisal referred to is
described in the "Loss Condition" section of the Building and Personal Property Form, and states that
if Harleysville and its insured "disagree on the value of the property or the amount of loss, either may
make written demand for an appraisal of the loss." *Id*. at 8.  The appraisal mechanism calls for each
party to select one appraiser and for the two party-selected appraisers to choose an umpire. A
decision agreed to by any two of the appraisers is binding on the parties, though Harleysville retains
the right to deny the claim entirely. *Id.* The Extra Expense Coverage contains a similar appraisal
provision.

**The Immediate Aftermath of the Canopy Collapse**.        Paul Corrado, a claims adjuster,
was originally assigned to handle SummerWind's claim for Harleysville, while Douglas Kerr and

Steven McKay worked on the claim for SummerWind.  Mr. Corrado acknowledged receipt of SummerWind's claim on February 19, 2003.  Plaintiff's Exhibit 5.

The communications between SummerWind and Harleysville are set forth in detail in Harleysville's adjuster log, which was marked as Plaintiff's Exhibit 4.  The log shows that both Mr. Corrado and SummerWind's representatives promptly contacted Birdair to determine whether Birdair would repair the collapsed portion of the canopy under the three-year warranty that Birdair had provided SummerWind upon completion of the performing arts center.  According to SummerWind, Birdair had represented to SummerWind that the canopy should last 30 years.

On March 5, 2003, Mr. Corrado spoke with Tom Wuerch of Birdair, who said that Birdair did not consider the damage to be a warranty item since Birdair believed the damage to be weather related.   On March 10, Mr. Wuerch sent a letter to SummerWind reciting Birdair's position that it did not believe its warranty covered the damage to the canopy and further stating that, at Mr. Corrado's request, Birdair was preparing a cost estimate to repair the canopy.  At this time, SummerWind still owed Birdair approximately $250,000, and Mr. Wuerch stated  in his letter that the Birdair debt would have to be resolved "before Birdair will return to the facility." Plaintiff's Exhibit 10.  Given SummerWind's financial condition at that time, SummerWind could not have come up with the money to pay off the Birdair debt.

In early March 2003,  Mr. Corrado decided to bring in an independent adjuster, Del Cade, to work on this loss. At about that same point, Cheryl McLaughlin took over responsibility for SummerWind's claim at Harleysville.  On March 14, Steve Dupre, Chief Building Inspector for the Town of Windsor, issued a letter to the owner of the SummerWind site, stating that "due to wind/storm damage, the SummerWind Amphitheater tent structure has become damaged to the

9

extent that it has become unsafe.  This structure must be repaired or removed" within 30 days.
Plaintiff's Exhibit 9.

On the same day, Birdair sent Harleysville an estimate to fabricate and install a replacement
tensioned membrane assembly for the damaged portion of SummerWind's canopy.  Plaintiff's Exhibit
11.  The price of the Birdair proposal was $250,000, though Birdair reserved its right to seek
additional compensation in the event further damage to the structure or the non-torn membrane were
discovered, or if modifications in the design details were required.  In effect, Birdair was proposing
simply to replace the rear portion of the canopy fabric.  The company projected that it would need
approximately 13 weeks for fabrication and installation of the new canopy fabric.  Birdair's proposal
expressly stated that it could be withdrawn if not accepted within 30 days.  However, contrary to Mr.
Wuerch's March 10 letter to SummerWind, Birdair's proposal was not conditioned on resolution of
its financial dispute with SummerWind.  Cheryl McLaughlin's log indicates that she received a copy
of Birdair's proposal on March 21.  SummerWind's lawyer (who had been retained because of the
possibility of a warranty claim against Birdair) received Birdair's proposal on March 28.  At about
the same time, Mr. Kerr sent a letter to Birdair asking it to reconsider its position on the warranty
and stating that in SummerWind's view, the damage had been caused by a "construction/product
defect."  Defendant's Exhibit 511.[2]

At or around the same time, Steven McKay of SummerWind decided to contact Soper's
Engineered Fabric Solutions ("Soper's"), another fabricator of canopy structures.  Mr. McKay
contacted Soper's because the collapse of the canopy after just one year of operation made

_____

[2] An internal email from John Berkey, later SummerWind's Executive Director, to Mr. Kerr,
states that he, too, believed that the cause of the canopy collapse was a "faulty" and "dangerous"
design.  Defendant's Exhibit 515.

SummerWind uncertain about Birdair's competence, and also because Mr. Weurch's March 10 letter gave SummerWind concern that Birdair might decline to repair the membrane pending resolution of the parties' financial dispute.  Soper's sent SummerWind a proposal dated March 27, 2003, in which it proposed to provide design, manufacturing and field services "to complete replacement of fabric membrane" for the SummerWind facility, with an objective of June 6, 2003 for completion of the work.  Plaintiff's Exhibit 15.  Soper's proposal estimated the cost of its work at $260,000 to $350,000, though it is clear from Soper's proposal that this is merely an estimate and that the final cost would be subject to the total time and materials necessary to complete the work.  Indeed, the cover email forwarding the proposal described it as a "preliminary estimate only."  Defendant's Exhibit 506.  Soper's proposal assumed replacement of the entire existing membrane and was based on Soper's understanding that it would be given access to Birdair's configuration designs for the canopy fabric.  The reason that Soper's proposal called for replacement of the entire membrane rather than only the rear portion (as Birdair had proposed) is that Soper's did not have access to Birdair's proprietary fabric and, therefore, Soper's would have to replace the entire membrane with its own fabric. A copy of Soper's proposal was also provided to Harleysville.

In early April, SummerWind hired a construction manager, Orlando Annulli & Sons, for the expected replacement of the canopy.  Brad Downey from Orlando Annulli initially authorized Soper's to commence work on its proposal. Defendant's Exhibits 508, 516, 517, 519.  Mr. Downey also informed Del Cade of SummerWind's decision to proceed with Soper's.  Defendant's Exhibit 507.  However, shortly thereafter, Mr. Downey told Soper's that it should cease all work on the proposal until further word from SummerWind.  Apparently, SummerWind's Board had decided to proceed with Birdair instead for, on April 8, Mr. Downey wrote to Birdair informing the company

that he thought the SummerWind Board would release the work to Birdair and requesting further detail regarding the scope of Birdair's proposal. Defendant's Exhibit 518.

Meanwhile, in April, Del Cade provided Cheryl McLaughlin with a report on the SummerWind claim. The report concluded that the cause of the damage to the canopy was the weight of snow and ice. Plaintiff's Exhibits 4 & 13. Mr. Cade's report also recited that coverage existed for this loss, and stated that he was working on the claim with the insured and Brad Downey. The report provides Mr. Cade's view that Birdair's proposal was more reasonable than Soper's, though he also thought that the Birdair proposal of $250,000 might be too high since it was for only a portion of the entire canopy and just one year earlier the total cost of the structure (fabric, masts, design, cabling, etc.) had been only $679,000. As a result, Mr. Cade stated that he had requested a complete breakdown of the Birdair proposal from Brad Downey. Mr. Cade also stated that he had been informed by subrogation counsel that SummerWind should not sign any contract with Birdair until Harleysville's subrogation attorney had reviewed it to "verify that there is no verbiage which would impact the potential subrogation claim." Plaintiff's Exhibit 13 at 2. Mr. Cade cautioned Ms. McLaughlin that Birdair needed a commitment "ASAP" in order to get the work done before the next season began. He recommended a partial advance to SummerWind of $100,000, which Ms. McLaughlin approved on April 24.[3] Unfortunately, however, rather than putting the $100,000 aside to cover the costs of future repairs, SummerWind, which was in a difficult financial condition at that time, used portions of the $100,000 on ordinary operating expenses.

By a letter dated April 17, Birdair notified Harleysville that since its proposal of March 14 had not been accepted within 30 days, it was being withdrawn. Plaintiff's Exhibit 12. Birdair never

---

[3] Mr. Cade's involvement appears to have ended by early May 2003.

made another proposal for, at or around the same time, Birdair's attorney had advised counsel for

SummerWind and Harleysville that Birdair would not in any event make any repairs to the

SummerWind facility unless both SummerWind and Harleysville waived their rights to sue Birdair

for the collapse of the canopy.  Plaintiff's Exhibit 14; Defendant's Exhibit 523.  Harleysville told

SummerWind that it would not waive its subrogation rights against Birdair.  *See* Plaintiff's Exhibit

4 ("We are not going to waive our subrogation rights.").  As a result, by late April, it was clear that

it was no longer feasible to expect Birdair to make the necessary repairs, since Birdair would not do

so without a waiver from Harleysville and Harleysville would provide no such waiver..

The Birdair development had two implications for SummerWind as Ms. McLaughlin

recognized in her notes.  First, the cost of repairs would be higher since any company doing the

repairs would not have access to Birdair's designs and would have to replace the entire membrane

and not just the rear portion.  Second, any company taking Birdair's place at this point probably

would not be able to get all of the work done in time for the start of SummerWind's summer 2003

season.  As Ms. McLaughlin put it:

> This will cause a problem for [SummerWind] . . . because they will have to have
> another company complete the repairs which will cost add[itional] money.  The
> Kevlar fabric that covers this structure is made exclusively by Birdair.  Another
> company would need to, therefore, replace all the fabric rather than just repair the
> damaged area. [Summerwind] already has a pre[liminary] est[imate] of $260-$350K.
> Also another company will not be able to make the 6/1/03 time[-]frame that
> [SummerWind] needs this to be completed by.

Plaintiff's Exhibit 4 at 6.  Puzzlingly, despite these statements recognizing the additional cost of

replacement that would now accrue to SummerWind, Ms. McLaughlin also stated immediately

thereafter that Harleysville "owe[d] the [insured] the reasonable cost of repairs *which is no more than*

*$250K*."  *Id.* (emphasis added).  This statement is inexplicable to the Court, since Ms. McLaughlin

13

knew at that time that the only proposal to effect repairs for $250,000 had been withdrawn and the company making that proposal, Birdair, was no longer willing to perform the work unless Harleysville waived a right that it was absolutely unwilling to waive.

Ultimately, SummerWind sued Birdair in state court, asserting that Birdair's faulty design was the cause of the damage to the SummerWind facility.[4]   That action has remained pending while this case has proceeded.  An expert hired on behalf of SummerWind in that case, Simpson Gumpertz & Heger, concluded that the combination of snow load and wind pressures in February 2003 were "substantially less severe than required [by the State Building Code] for the design" of the SummerWind canopy.  Because the snow and wind loads were significantly less than those required for the proper design of the structure, the expert concluded that the failure of the Birdair canopy was caused by one of the following:

* Inadequate design for snow loads and for the combination of snow and wind loads

* Inadequate fabric-to-structure connection design

* Defective fabric or fabric seams.

Plaintiff's Exhibit 19 at 6.

**Soper's Involvement and the Summer 2003 Season.**    Once it became clear in late April that neither Harleysville nor SummerWind could count on Birdair to repair the facility, SummerWind's focus returned to Soper's.  However,  Soper's informed SummerWind that given the delay in getting Soper's started, Soper's could no longer complete the work by the start of the 2003

---

[4]  Harleysville's Property Claims Direct Supervisor Robert DeMayo inspected the loss on May 1, 2003. In a report of the inspection, Mr. DeMayo  stated that the weight of snow and ice on the fabric caused the roof fabric to tear.  He also noted that SummerWind had suggested that the snow loads involved were less than the design specifications for the facility.

season (just as Ms. McLaughlin had predicted).  Therefore, SummerWind's Board decided not to proceed with the work outlined in Soper's March 27 proposal. Instead, the Board decided to proceed with a two-stage program.  First, SummerWind would make temporary alterations and repairs to the structure, using a temporary band shell to cover the rear portion of the canopy area so that it could proceed with its summer 2003 season as scheduled.  Soper's was asked to perform the remediation work needed for the first stage and Soper's provided a $47,400 estimate to "design, supply materials and provide installation supervision services for summer 2003 remediation relating to Owner's procurement of a non-snow rated, seasonal shell and re-tensioning and re-rigging of existing membrane."  Plaintiff's Exhibit 17. Second, SummerWind engaged Soper's to provide an estimate for the permanent replacement of the canopy, upon which SummerWind hoped to embark in the fall of 2003, after close of the summer season.  To perform all of this work, Soper's engaged FTL Design Engineering Studio; Timothy Thiel was retained by FTL to be its site manager.

To protect its performers, SummerWind located a seasonal band shell to be incorporated into the remediated structure. Steven McKay informed Cheryl McLaughlin of SummerWind's two-stage plan in late May.  The plan was acceptable to Harleysville, and the insurer agreed to cover the costs of the band shell as well as Soper's remediation costs under SummerWind's Extra Expense Coverage, which, as previously indicated, was designed to allow an insured to avoid or minimize the suspension of its business and to continue operations during the period of restoration. Harleysville purchased the temporary bandshell on behalf of SummerWind for approximately $47,000.   Ms. McLaughlin also told Mr. McKay to firm up Soper's proposal for permanent repairs in the fall of 2003.  Throughout the summer, she repeatedly asked Mr. McKay how the plans were proceeding for the permanent repairs, but each time Mr. McKay told her that he was so busy with the season that

he had not had time to get around to the permanent repairs.  Ms. McLaughlin acknowledged that she never asked anyone at SummerWind to file a sworn proof of loss, and none was ever filed.

Tim Thiel oversaw the remediation work, which was successfully completed by the end of June.  An engineer certified to the Town that the repair work had been done satisfactorily. Plaintiff's Exhibit 18.  During his remediation work on the canopy at this time, Mr. Thiel became concerned that the damage to the structure was more substantial than previously thought. In a report to Soper's in June 2003, Mr. Thiel informed Soper's that his close-up inspection of the canopy showed that there had been more severe damage to the structure than had previously been suspected.   In particular, the masts were out of plumb as a result of the release of the tension provided by the fabric. Also, he had to re-tighten most of the connection points. Plaintiff's Exhibit 42.  In Mr. Thiel's view, every structural location for the canopy had been compromised by the collapse.

The temporary repairs allowed SummerWind to proceed with its summer 2003 season. Because they were unable completely to cover the area previously covered by the rear portion of the canopy, SummerWind was unable to use about 300 seats toward the stage portion of the facility. Nevertheless, the second season appears to have been a success with audiences, since SummerWind sold more tickets.  The losses continued, however.  SummerWind lost approximately $233,000 on its 2003 season, $100,000 less than the summer 2002 season.

**Fall 2003-Winter 2004.**      At the end of the 2003 season, Ms. McLaughlin asked Mr. McKay whether SummerWind had any further need for the band shell. Mr. McKay responded that SummerWind expected to effect a permanent fix to its structure before the start of its summer 2004 season and therefore had no interest in retaining the shell. Accordingly, Ms. McLaughlin asked the Harleysville property department to find a buyer for the unwanted band shell.  Harleysville

advertised it on a website, but no one put in an offer and the property department told Ms. McLaughlin that it could not find a buyer.  Some time later, CT Audio, a company that was doing work for SummerWind on the site, offered to buy the shell for $6500, and Ms. McLaughlin approved the sale to CT Audio. At trial, SummerWind's witnesses and attorneys complained bitterly about the sale of the band shell, contending that Harleysville should never have sold the band shell and that, in any event, Harleysville should have obtained more than $6500 for it.  However, the reality is that the Executive Director of SummerWind told Ms. McLaughlin that Summerwind had no interest in the band shell and that Harleysville should sell it,  and there is no indication that Ms. McLaughlin knew or should have known that the price offered by CT Audio was inadequate. So far as the Court is concerned, SummerWind's complaints about the band shell are merely post-hoc sour grapes.

Even though it passed on keeping the band shell, SummerWind and Soper's still had not finalized their plans for a permanent repair by the fall of 2003, and those repairs did not take place at that time.  Instead, SummerWind proposed another two-step plan to Harleysville.  The first step would be to take down the temporary structure that Soper's had created in May 2003 since it was not safe to leave it up through the winter snows.  At the same time, Soper's would do a controlled take down of the rest of the Birdair canopy since Soper's would eventually have to replace the entire canopy membrane when it effected the permanent repairs. Second, Soper's would make the permanent repairs to the structure in the spring of 2004 once Soper's had completed unspecified further design and engineering work.  In a telephone conversation with Ms. McLaughlin on November 20, 2003, Mr. Kerr, the insurance agent and Treasurer of SummerWind, informed Ms. McLaughlin of this plan and stated that "he is aware that [SummerWind is] only entitled to put this structure back to the way it was before and that is what is being estimated" by Soper's.  Ms.

17

McLaughlin later approved Soper's estimate of $19,000 to take down the temporary structure. During these conversations between Ms. McLaughlin and Mr. Kerr, Mr. Kerr raised the issue whether the front section of the canopy had also been damaged as a result of collapse of the rear portion of the canopy, a subject that Mr. Thiel had raised with Soper's in June 2003.  Mr. Kerr and Ms. McLaughlin  agreed that the best way to resolve that issue was to have Soper's engineers meet with Harleysville's engineers and inspect the structure at the time of the controlled take down.

In late December 2003, Harleysville issued another check to SummerWind, this time for $145,000, for the building loss. That brought Harleysville's advances on the building loss to $245,000.  Ms. McLaughlin arrived at that figure by taking Birdair's March 2003 estimate of $250,000 as the cost of repair and deducting $5,000 for SummerWind's deductible.  In early January, Harleysville made additional payments to SummerWind under the Extra Expense Coverage.

As planned, in February 2004, the canopy was taken down by Soper's (whose team was again led by Tim Thiel) in the presence of engineers hired by Harleysville: Joe Zona and Dominic Kelly. Ms. McLaughlin's log indicates that the engineers told her that the front section of the canopy was also ripped and damaged at the link loops and that they "attribute this to weight of ice and snow." Plaintiff's Exhibit 4 at 18.   They examined the fabric when it was down and "found creases/lines in the fabric which tend[] to form when fabric is being stretched in 2 different directions.  It was a similar condition that was found in the rear fabric. [The engineer] also found 2 holes in the fabric at 1 mast and 1 at the other mast . . . [and] *is in agreement that the front section was also damaged and need[s] to be replaced*." *Id.* (emphasis and alterations added).  Ms. McLaughlin's log for March 29, 2004 states: "Expert has confirmed that front section also damaged and needs to be replaced. [SummerWind] in process of obtaining est[imate]." *Id.* at 20. At trial, Mr. Kelly acknowledged the

damage to the front section of the canopy, but stated that the damage was to the fabric and not to the structure.   He also testified that the damage to the front portion of the fabric came about after the February 2003 collapse as a result of a loss of tension that occurred when the rear portion collapsed.

At long last, on April 7, 2004, Soper's provided its estimate for "Membrane supply, structural modifications, site preparation & installation."  Plaintiff's Exhibit 25.  This time, the estimated (not firm) price was $675,000, which, as Ms. McLaughlin noted with an exclamation mark in her log, was essentially the same amount as Birdair's original contract to construct the entire SummerWind performing arts structure (engineering, masts, steel, cables, and fabric).  Ms. McLaughlin called Mr. Kerr about the latest estimate, and he told her that SummerWind was also taken aback by Soper's proposal and had asked Soper's to explain why the estimate for repairs was so much higher than it had been just one year earlier. Plaintiff's Exhibit 4.   At or around the same time, Harleysville received word that SummerWind was complaining about Harleysville's sale of the band shell to the Connecticut Insurance Commissioner.

By a letter dated April 21, 2004, Ms. McLaughlin wrote to Mr. Berkey, then Executive Director of SummerWind,  recounting the handling of the claim from Harleysville's perspective. Plaintiff's Exhibit 26.  The letter acknowledges Soper's $675,000 proposal and states that "[t]his estimate is to replace the entire structure with a totally different structure with a different design and a different cabling system."  *Id.*   Accordingly, Harleysville rejected that estimate "as it is not replacing the existing structure." *Id.*   At this point, it is fair to say that the relationship between the parties broke down completely, though the Court ascribes principal blame for that breakdown to SummerWind, since Harleysville (unlike SummerWind) appears to have remained willing to continue discussions about the proper reimbursement under the policy.

19

At trial, Mr. Gallagher of Soper's described the work that was included in its $675,000 proposal. The proposal is not limited to merely replacing the existing canopy membrane. Instead, the proposal called for a redesign of the canopy structure so that the membrane would lie less flat and would have steeper pitches. As Mr. Gallagher explained, these changes were made to allow the canopy to shed snow and ice better than the Birdair design. To accomplish this work, Soper's proposed to use the existing masts but increase their height by approximately four feet, add two additional masts and two additional huge concrete footings, and rework cables and connections. Soper's original re-design of the structure called for it to be approximately twelve feet higher than the Birdair design, but that was reduced to approximately four feet after the owner of the property objected to the proposed height of the Soper's re-design.[5]

A draft of Soper's contract with FTL for the design work on Soper's proposal was admitted as an exhibit at trial and states:

> Permanent remediation design services shall include development of a re-design of the membrane for structural optimization, including, but not limited to, development of a new structural shape (within the limits of the site and other constraints) to optimize the structural performance of the membrane, retrofit of existing steel and other related upgrades for a permanent snow-load design.

Defendant's Exhibit 512. Mr. Gallagher testified that while Soper's never evaluated the Birdair original design to determine whether it was structurally sound, he was not comfortable with the Birdair design. For example, he testified that he had observed pooling of water and ice on the canopy membrane, a condition that he viewed as "inappropriate," and he wanted Soper's design to prevent pooling. He also testified that he had no confidence in Birdair's design in view of the

---

[5] Soper's expended approximately $66,000 on the original re-design (at 12 feet higher than Birdair's) and then had to expend further sums on the reduced height (4 feet) re-design.

collapse.   It was apparent to the Court that Soper's was unwilling simply to stretch new fabric on the existing Birdair structure because Soper's feared that any such solution would risk a similar collapse from the weight of snow and ice.  As Mr. Gallagher testified, Soper's decided to change the configuration and geometry of SummerWind's canopy structure "so he could sleep at night."  When asked to explain what he meant by that, Mr. Gallagher said that he did not want Soper's to inherit the same problems that had caused the Birdair membrane to collapse in the first place.

To the Court's great frustration, and despite repeated requests for clarification, SummerWind and Soper's each declined to say how much of Soper's 2004 proposal was for simple replacement of the existing structure and how much of the proposal was for the additional design, engineering, materials, and construction related to remedying the defects in Birdair's original design. Thus, for reasons known only to SummerWind, it chose to continue at trial the same "all or nothing" approach to coverage of Soper's 2004 proposal that it had taken with Harleysville prior to the commencement of this lawsuit.   For an entity that presumably was trying to get a new structure built promptly, the Court finds most perplexing SummerWind's intransigence on the question of the proper breakdown of Soper's April 2004 proposal.

**Summer 2004 and Beyond.**    By late April 2004, SummerWind had no facility at all (the tent had been taken down in February), Harleysville had rejected Soper's estimate, and SummerWind had no realistic means of financing Soper's proposal on its own. Therefore, SummerWind decided to proceed with the summer 2004 season without any canopy at all.  Unfortunately, the summer of 2004 was very rainy, and SummerWind's draw was less than in prior years.  Ironically, however, SummerWind had an operating net profit of $50,000, principally the result of fund-raising efforts.

At some point during the summer of 2004, the parties had discussions with Connecticut's

Insurance Commissioner in an attempt to resolve their dispute.  Ms. McLaughlin sought additional information regarding Soper's April 2004 proposal from Douglas Kerr and, in September, she also met with Mr. Gallagher of Soper's in an effort to learn more about why Soper's was proposing to re-design the SummerWind structure.  During that time period, Harleysville offered SummerWind $350,000 to resolve the building loss claim (an increase of $100,000 over the $250,000 Harleysville had already paid).  Ms. McLaughlin testified that Harleysville arrived at the $350,000 based on the top end of Soper's March 2003 proposal to replace the entire canopy membrane.  In any event, SummerWind rejected Harleysville's offer, and it does not appear that SummerWind ever made a counteroffer.  Instead, SummerWind insisted that Harleysville pay the entire amount of Soper's April 2004 proposal though SummerWind never provided Harleysville with any breakdown of Soper's proposal.  According to SummerWind's counsel, it was Harleysville's obligation to obtain a breakdown of Soper's proposal, not SummerWind's, a position the Court finds baffling since it was SummerWind that originally asked Soper's to prepare an estimate for a permanent fix.

This lawsuit was filed in February 2005 and was tried to the Court one year later.[6]  In connection with the litigation, Soper's updated its estimate in October 2005.  Soper's now estimates that its proposed work would cost $789,700.  The building coverage limit on the Harleysville policy is $800,000.  Furthermore, according to Mr. Kerr, SummerWind no longer has the $245,000 that it had previously received from Harleysville to replace the canopy, having spent it all on normal operating expenses and bills from Soper's.  Given SummerWind's financial condition, unless it

---

[6]   The following witnesses testified at trial or by deposition: John Berkey; Cheryl McLaughlin; Stephen Dupre; Timothy Thiel; Dr. Gerald Sazama; Dominic Kelly; Joseph Zona; Douglas Kerr; Dr. Richard Wise; Bradford Downey; Stephen McKay; Jamie Gallagher; Del Cade; Robert Binner; David Ricci; and Cheryl Macintosh.

prevails in this litigation, SummerWind cannot realistically rebuild its performing arts center.  The Board of SummerWind decided to cancel the 2005 season in its entirety, and the Court was informed that the Board had not yet decided whether to cancel the 2006 season or go forward without a canopy.

As damages in this action, SummerWind seeks the following amounts: $789,700 under the Building Loss policy, less the $245,000 already paid on that policy; an additional $34,904.36 on the Extra Expense policy; lost profits of $1,209,208 for Harleysville's alleged breach of its insurance contract; $290,000 for the cost of making SummerWind's credit rating whole; and attorneys' fees of $410,698.  The Court notes with considerable chagrin that, so far, SummerWind's attorneys have apparently expended on this litigation nearly two-thirds of what Birdair charged to build SummerWind's performing arts center in the first place.

## II.

SummerWind advances two claims in this litigation. First, SummerWind asserts that Harleysville breached its contract of insurance with SummerWind by failing to pay the amounts required by the policy as a result of the collapse of the canopy in February 2002.  Second, SummerWind claims that Harleysville breached the covenant of good faith and fair dealing, both substantively and procedurally, by the manner in which it dealt with SummerWind's loss and insurance claim.  The parties agree that both claims are governed by Connecticut law.  Resolution of the breach of contract claim is more difficult since Connecticut courts have not yet  addressed the precise legal issue that this case presents.  The claim for breach of the covenant of good faith and fair dealing, however, is not even a close question, and will therefore be dealt with briefly before the Court turns to the real issue in this case – namely, whether Harleysville has breached its contract of

insurance.

## A.

Connecticut has long recognized an independent action in tort arising from a breach of an insurer's common law duty of good faith and fair dealing. *Buckman v. People Express, Inc.*, 205 Conn. 166, 170 (1987); *see also McCauley Enterprises, Inc. v. New Hampshire Ins. Co.*, 716 F. Supp. 718, 723 (D. Conn. 1989). "[I]n every contract of insurance the duty 'to act in good faith and fairly in handling the claim of an insured, namely a duty not to withhold unreasonably payments due under a policy' [i]s necessarily implied." *Grand Sheet Metal Prod. Co. v. Protection Mut. Ins. Co.*, 34 Conn. Supp. 46, 50 (Conn. Super. Ct. 1977) (quoting *Gruenberg v. Aetna Ins. Co.*, 510 P.2d 1032, 1037 (1973)). This cause of action is "separate and distinct from [a] plaintiff's statutory claims." *Buckman*, 205 Conn. at 170.

As discussed below, the Court concludes that SummerWind has not established a breach of contract by Harleysville. That conclusion necessarily disposes of the substantive portion of SummerWind's good fair and fair dealing claim. For as the Connecticut Supreme Court has explained, the doctrine of good faith and fair dealing is essentially "a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy." *Magnan*, 193 Conn. at 567.

However, the Court's resolution of SummerWind's breach of contract claim does not resolve the procedural portion of SummerWind's bad faith claim. For SummerWind's procedural bad faith claim focuses on the manner in which Harleysville dealt with SummerWind's loss. The Connecticut Supreme Court has not explicitly recognized a claim for procedural bad faith, though at least one of

24

this Court's colleagues has held that a procedural bad faith claim is cognizable under Connecticut law even if the insurer has not breached the express terms of the policy.  *See Royal Ins. Co. of America v. Zygo Corp.*, 349 F. Supp. 2d 295, 313 (D. Conn. 2004); *United Tech. Corp. v. American Home Assurance Co.,* 118 F. Supp. 2d 181, 187 (D. Conn. 2000).  Harleysville does not contest that Connecticut recognizes a claim for procedural bad faith, and in any event, as explained below, the Court finds that Harleysville's conduct did not constitute procedural bad faith.  Therefore, this Court need not, and does not, decide whether the Connecticut Supreme Court will ultimately  recognize a cause of action for procedural bad faith in this context.

SummerWind's counsel admitted that Harleysville was extremely responsive to SummerWind's predicament and acted in good faith until April 2004. This concession was wise in view of the testimony of Steven McKay, SummerWind's Executive Director, that Harleysville was responsive to all of SummerWind's requests during his tenure and that Cheryl McLaughlin was fair and professional at all times.  Indeed, Harleysville advanced SummerWind nearly $250,000 on the building loss policy even before it had a final estimate for the permanent repair of the facility, and Harleysville paid SummerWind all or  nearly all of the $100,000 of the Extra Expense Coverage to allow Summerwind to continue its operations pending completion of the repairs to the canopy. Accordingly,  SummerWind focuses on two aspects of Harleysville's conduct after April 2004:  (1) Harleysville's sale of the bandshell in early 2004 without first offering it to SummerWind or getting a reasonable price for it; and (2) Harleysville's rejection of Soper's April 2004 proposal and its delay in resolving SummerWind's claim, which undoubtedly has severely disrupted SummerWind's business.

The Court disagrees with each of SummerWind's contentions and finds that at all times

Harleysville acted in good faith.  The Court has previously discussed the bandshell claim.  Suffice it to say, the Court finds this claim factually untenable. The same observation applies to SummerWind's allegations regarding Harleysville's reaction to Soper's April 2004 proposal and the failure to resolve this claim more promptly.  Harleysville rightly questioned Soper's April 2004 proposal as representing more than its policy covered.  Even if Harleysville was mistaken in that view, however, the record shows that SummerWind at no time provided Harleysville with any details or breakdown of the proposal from which Harleysville could discern what portion of the proposal was attributable to the new and upgraded design and what portion was for replacement using the Birdair design.  Indeed, to this very day SummerWind has even declined to provide the Court with that information, a stance that this Court finds inexplicable and counter-productive.

To be sure, Harleysville fixated on Birdair's $250,000 estimate, which the Court has already explained was not a feasible estimate in view of Harleysville's own position that it would not waive its subrogation rights.  Therefore, in the Court's view, $250,000 should never have been the "floor" for the repair work.  But it was not the floor because Harleysville later offered SummerWind $350,000 for the building loss, an offer that SummerWind flatly declined.  In any event, Harleysville never said that it would not pay more than $250,000 or even $350,000, only that it would not pay for a newly designed structure, as represented by Soper's April 2004 proposal, a position that this Court finds was well-founded.

However, the most fundamental defect in SummerWind's good faith claim is that, at all times, SummerWind had the means at its disposal to resolve the amount of its loss with promptness and certainty, and yet SummerWind chose not to employ the means at its disposal. What the Court is referring to is the right of appraisal in the Harleysville policy.  Under that provision of the policy,

26

SummerWind could have compelled Harleysville at any time to participate in a prompt and relatively inexpensive appraisal process, one in which the appraisers' determination of the amount of loss would have been final and binding on Harleysville. It is true that the appraisal provision does not waive Harleysville's right to contest coverage but, since Harleysville had already accepted coverage in this case, the appraisers' determination of SummerWind's loss would have been binding on it.

For reasons that this Court remains at a loss to understand, SummerWind chose not to avail itself of this straightforward and prompt appraisal process and instead chose to engage in protracted and enormously expensive litigation in court. Having refused to this day to provide details regarding Soper's April 2004 proposal and having eschewed the prompt and efficient remedy provided in the policy for resolving disputes over the amount of its loss, SummerWind cannot credibly maintain that Harleysville has acted in bad faith in this case. *See Buckman*, 205 Conn. at 171 ("'[g]ood faith and fair dealing mean an attitude or state of mind denoting honesty of purpose, freedom from intention to defraud and generally speaking means faithful to one's duty or obligation . . . an honest intention not to take an unconscientious [sic] advantage of another'; '[b]ad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties.'" (alterations in original)). Accordingly, judgment should enter for Harleysville and against SummerWind on Count Two of the Complaint alleging breach of the implied covenant of good faith and fair dealing.

**B.**

SummerWind's breach of contract claim is principally founded on its argument that Harleysville is obligated under its building loss policy to pay SummerWind the full amount

27

estimated by Soper's, a sum that as of October 2005 was $789,700, less the $245,000 already advanced to SummerWind.  Harleysville contests SummerWind's claim on a number of grounds, only one of which the Court finds to be meritorious.[7] Harleysville asserts that under the policy it is responsible only for the cost to replace the canopy with "property of like kind and quality" and that Soper's proposal is not for such a replacement but rather for an improved and upgraded facility that is designed, engineered and constructed to correct the design defects in the Birdair structure that led to the collapse of the canopy in the first place.  In the circumstances of this case, the Court agrees with Harleysville.

1.      As an initial matter, the Court finds that Harleysville has demonstrated that Soper's April 7, 2004 and October 2005 proposals contemplate an upgraded structure for the SummerWind facility so that it will better shed snow and ice and thereby bring the structure into compliance with existing building codes and avoid problems like those that led to the collapse in February 2003. While neither Soper's nor SummerWind was willing at trial firmly to commit on the cause of the

---

[7]  For example, Harleysville argues that it is not required to pay SummerWind anything because SummerWind never filed a proof of loss.  But Harleysville never asked for a proof of loss and continued to process the claim in the absence of one. Therefore, Harleysville waived that requirement.  Harleysville also contends that it is not required to pay for any loss until the structure is actually repaired or replaced, and obviously that has not happened yet.  But courts have found a duty on the insurer to reimburse the insured before rebuilding takes place when, as here, the insured does not have the means to rebuild the facility without the insurance proceeds. *See, e.g., Zaitchick v. American Motorists Ins. Co.*, 554 F. Supp. 209, 217 (S.D.N.Y. 1982); *Pollock v. Fire Ins. Exch.*, 423 N.W. 2d 234, 237 (Mich. Ct. App. 1988). The Court believes that Connecticut courts would adopt those decisions as the law of Connecticut and, therefore, the Court rejects Harleysville's claim.  Finally, Harleysville argues that its policy obligations are conditioned upon the insured replacing the property within a reasonable time after incurring the loss and that SummerWind has not done so. However, if Harleysville's failure to pay Soper's estimate was the reason why the facility has not been repaired sooner, then surely Harleysville could not defend its conduct on this basis.  Therefore, this argument by Harleysville does not add anything to its main argument, which is that it is not required to pay the full cost of Soper's 2004 estimate.

collapse, simple common sense reveals that if they believed the cause of the collapse was a defect in the fabric alone, Soper's would have simply replaced the canopy fabric, a project that it proposed to do in 2003 for between $250,000-360,000. The 2004 and 2005 proposals were significantly more than the 2003 proposal (nearly three times the low end of the 2003 proposal) because Soper's and SummerWind concluded that replacement of the torn canopy membrane was insufficient and that the structure itself had to be redesigned and configured so that it could carry and shed the quantities of snow and ice loads that a safe and proper design would manage.

In this regard, the Court notes that the only expert to testify at trial on the cause of the collapse testified without contradiction that the snow loads and wind pressure experienced by the Birdair canopy in or about February 2003 were "substantially less severe" than the minimum tolerance required by the State Building Code for the design of the canopy, namely, resistance to 30 pounds of pressure per square foot. Moreover, in its answers to interrogatories in the litigation with Birdair, SummerWind stated that its experts would testify to the improper design, manufacture and installation of the tent membrane and "how weather factors were well below design minimum condition." Defendant's Exhibit 502 ¶ 4. In further answers, SummerWind stated that the "[d]esign of canopy was not to support snow or rain load." *Id.* ¶ 20.[8] And in its Answer and Counterclaim in the Birdair litigation, SummerWind also stated that "[a]t the time the Project's Roof was damaged, the layer of snow covering it did not exert more than thirty pounds of pressure per square inch," the state building code requirement. Defendant's Exhibit 514 at 8.

Furthermore, Mr. Gallagher conceded that Soper's proposal called for a much steeper pitch

---

[8] These allegations are not only consistent with the report of SummerWind's experts but also with Mr. Berkey's email to Mr. Kerr, dated March 7, 2003, in which Mr. Berkey refers to Birdair's "faulty design" and "dangerous design."

on the canopy, with the attendant need to increased the height of the masts and add two additional masts, associated cabling and steel work, and two large concrete footings. These changes were not made for aesthetic effect or because Soper's fabric required them; instead, Mr. Gallagher admitted that substantial changes were made because he was concerned about the snow load performance of the original structure and that the changes were needed to protect public safety. As he acknowledged, Soper's decided it needed to "upgrade" the SummerWind structure beyond the Birdair design and construction to achieve better sloping, snow shed and snow performance, and that Soper's did this in order to comply with building codes that existed at the time Birdair designed and constructed the original structure.

Therefore, the Court has little difficulty concluding based upon the testimony of witnesses and the documentary evidence submitted that Soper's proposal calls for an upgraded and differently configured  structure than previously existed at the site and that the substantial changes Soper's proposed were designed to ensure that the structure complied with building code regulations and design criteria that the original Birdair structure should have complied with but unfortunately did not. In short, Soper's proposal does not merely replace the existing structure; rather, it contains additional, albeit unquantified, costs that are directly attributable to re-designing and re-constructing the structure to remedy design defects that existed in the original structure. The question, then, is whether SummerWind's replacement cost insurance policy covers those additional costs, and if not, what amount SummerWind is entitled to under the policy.

2.     Before analyzing the Harleysville policy, the Court notes that the parties agree on the standards that govern construction of insurance policies under Connecticut law. In Connecticut, insurance policies, like other contracts, are to be construed to effectuate the intent of the parties as

expressed in the language used in the policy.  *Travelers Ins. Co. v. Namerow*, 257 Conn. 812, 826 (2001).  The determinative question is "what coverage the . . . [insured] expected to receive and what the [insurer] was to provide as disclosed by the provisions of the policy."  *Id.* (alterations in original; internal quotation marks omitted).  The Court must view the policy in its entirety and, if a policy provision is clear and unambiguous, it should be enforced in accordance with its terms.  As the Connecticut Supreme Court has emphasized:

> 'If the words in the policy are plain and unambiguous the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties.'

*Buell*, 259 Conn. at 545 (quoting *Hammer v. Lumberman's Mut. Cas. Co.*, 214 Conn. 573, 583 (1990)).  Furthermore, a court should "'not torture words to import ambiguity, where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings.'" *Buell,* 259 Conn. at 545 (quoting *Downs v. Nat'l Cas. Co.*, 146 Conn. 490, 494-95 (1959)); *see also Alstrom Power, Inc. v. Balcke-Durr, Inc.*, 269 Conn. 599, 610-611 (2004).  However, if the language of the policy manifests some ambiguity, a court must construe the provision in favor of the insured and to provide coverage.  *Buell*, 259 Conn. at 545; *McGlinchey v. Aetna Cas. & Surety Co.*, 224 Conn. 133, 137 (1992).

With these standards in mind, the Court finds that the Harleysville policy is not ambiguous and that it does not cover the added costs of re-engineering and re-constructing SummerWind's facility to comply with existing building codes and to correct design defects in the original Birdair design.  In reaching this conclusion, the Court relies on several portions of the policy.  First, in the Loss Payment section, the policy provides that Harleysville will "[r]epair, rebuild or replace the

property with other property of *like kind and quality*, subject to b. below." Plaintiff's Ex. 1, Building & Personal Property Coverage Form at 8 (emphasis added). Subsection b explicitly states that the "cost to repair, rebuild or replace does *not* include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property." *Id.* at 9 (emphasis added). Similarly, the Replacement Cost provisions state that Harleysville "will not pay more for loss or damage on a replacement cost basis than the "cost to replace the lost or damaged property with other property [o]f comparable material and quality." *Id.* at 13.

It is true that SummerWind's policy included Additional Coverage and that the Additional Coverage provisions included a section entitled "Increased Cost of Construction," which states that Harleysville "will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of the property." *Id.* at 4. However, that undertaking is subject to a number of limitations, the most important of which for current purposes provides that Harleysville "*will not pay any costs due to an ordinance or law that: (a) You were required to comply with before the loss even when the building was undamaged; and (b) You failed to comply with*." *Id.* (emphasis added). Those words could not be clearer. Finally, the policy provides that Harleysville "will not pay for loss or damage caused by or resulting from . . . [f]aulty, inadequate or defective . . . [d]esign, specifications [or] workmanship." Causes of Loss – Special Form at 3.

Based upon the foregoing language of the policy, which the Court finds is clear and unambiguous, SummerWind is entitled to recover the costs of replacing its structure with one of similar or comparable kind and quality. However, Harleysville is not liable for the increased costs attributable to complying with ordinances that existed before the loss and need not pay the additional

32

costs of re-designing and re-building the structure so as to remedy design defects in the pre-existing structure. The policy shifts those additional costs onto the insured, undoubtedly in the expectation that the insured will recover any such additional costs from the original manufacturer, as in fact SummerWind is trying to do in its lawsuit against Birdair. Further buttressing the Court's plain meaning reading of the Harleysville policy is the testimony of Douglas Kerr, SummerWind's Treasurer and an experienced insurance agent who procured the Harleysville policy for SummerWind. Mr. Kerr testified that he understood that the Harleysville policy would not cover the additional costs of re-designing the facility to remedy defects in the Birdair design. This understanding is correct, and makes SummerWind's adamant response to Harleysville in April 2004 all the more puzzling.

In support of its argument to the contrary, SummerWind relies on a number of cases from jurisdictions other than Connecticut. One line of cases that SummerWind invokes deals with a situation where building codes change between the time the structure was originally built and the time it must be replaced. The decisions SummerWind cites allow recovery for the costs of complying with new building codes and ordinances *See, e.g.*, *Prytania Park Hotel v. General Star Indemnity Co.*, 896 F. Supp. 618, 623 (E.D. La. 1995); *Bering Strait School Dist. v. RLI Ins. Co.*, 873 P.2d 1292, 1295-96 (Alaska 1994); *Unified School Dist., No. 285 v. St. Paul Fire & Marine Ins. Co.*, 627 P.2d 1147, 1153-54 (Kan. Ct. App. 1981); *Starczewski v. Unigard Ins. Group*, 810 P.2d 58, 62 (Wash. Ct. App. 1991). The rationale for including the cost of compliance with newly enacted codes is that "the average person would believe that 'the amount necessary to repair or replace the damaged property' includes the amount necessary to comply with mandatory building codes enacted after the policy was issued." *Starczewski*, 810 P.2d at 62. However, courts are not unanimous even on this

point, and some courts have held that post-loss code changes are not covered by replacement cost policies similar to Harleysville's. *See, e.g.*, *Spears v. Shelter Mut. Ins. Co.*, 73 P.3d 865, 869-70 (Okla. 2003); *Bischel v. Fire Ins. Exch.*, 1 Cal. App. 4th 1168, 1178 (1991).

Connecticut courts have not yet addressed this issue, but  the Court need not decide which line of authority Connecticut might adopt, because the cases are inapposite.  First, no one here has claimed that building codes changed or that new requirements were imposed after construction of the original facility. Second, unlike the policy in *Starczewski* and the other cases cited, the Harleysville policy has specific provisions covering the increased cost of complying with newly enacted building codes and those provisions expressly limit Harleysville coverage to, in this case, a maximum of $10,000.

SummerWind also relies on cases from other jurisdictions discussing the meaning of policy phrases such as "like kind and quality" or "comparable kind and quality." For example, SummerWind relies  heavily on *Republic Underwriters Ins. Co. v. Mex-Tex, Inc.*, 150 S.W.3d 423 (Tex. 2004). In *Republic Underwriters*, an insured replaced its roof with one of the same kind but attached differently to the house. The cost of replacing the roof with an identical and identically-attached roof was $145,460, while the insured's cost was $179,000.  The  Texas Supreme Court held that policy language requiring a roof of "comparable material and quality" did not require the insured to replace the roof with an identical one.  *Id.* at 425.  According to the court, "comparable" does not mean "identical. The policy clearly allows for more leeway than that."  *Id.*  In view of the fact that the only expert called at trial testified that the two roofs were in fact  "comparable," the court held that there was coverage for the increased cost of the new roof.

34

*Republic Underwriters*, and cases like it, are distinguishable from SummerWind's case.[9] Like the Court in *Republic Underwriters*, the Court does not interpret the phrase "like kind and quality" to mean "identical." Indeed, the Court recognizes that an "identical" replacement is not possible in this case since Birdair's fabric was proprietary and Soper's fabric will not be the same as Birdair's. However, in this case no one testified at trial that Soper's design was even "comparable" to the Birdair design.  To the contrary, Mr. Gallagher testified that there were important differences between the two designs, differences that were required to remedy defects and code problems in the original design.   Furthermore, Harleysville does not rely solely on the "like kind and quality" language in the policy but also relies on portions of the policy explicitly dealing with the need to conform the structure to code requirements that existed at the time of the loss and disclaiming any obligation to pay for design defects.  In sum, the clear and unambiguous language of the policy indicates that there is no coverage for costs incurred to remedy the defects and code noncompliance in the original Birdair design, and whatever "leeway" or flexibility may exist in the use of phrases like "like kind and quality" is not sufficient to encompass substantial additional changes and upgrades made with just that purpose.  *Cf. Spears*, 73 P.3d at 868-69 (remarking that other decisions "are not extremely helpful because the wording of each policy clause is different").

    **3.**       The Court's interpretation of the insurance policy  necessarily leads to the conclusion that Harleysville did not breach its contractual obligations by refusing to pay for the costs of either

---

     [9] SummerWind also relies heavily on *North River Ins. Co. v. Godley*, 189 S.E. 577 (Ga. Ct. App. 1936).  That case also is distinguishable.  There, the insurer argued that the value of the old roof was less than that of the new roof after repairs, and therefore, the policy, which was limited to replacement with "materials of like kind and quality" would not cover the increased cost.  In effect, the insurer argued that the insured should have replaced the roof with old shingles, a proposition the court had little difficulty rejecting.  That decision provides no guidance in resolving the question presented in this case.

Soper's April 2004 or October 2005 proposals, the only estimates that SummerWind provided the insurer.  However, it is also clear to the Court that Harleysville's $250,000 payment to SummerWind is not sufficient to fully discharge its obligations under the building loss policy. The $250,000 sum paid to date  is identical to the estimate that Birdair gave in March 2003, an estimate that the Court does not believe is an adequate proxy for replacement cost under the terms of the policy.  This is so for several reasons. First, the Birdair estimate only covered replacement of the rear portion of the canopy, whereas Harleysville now concedes that the entire canopy must  be replaced. Second, Birdair's proposal was no longer feasible as of April 2003 because Birdair would not do the work proposed without a subrogation waiver, and Harleysville was unwilling to provide such a waiver. Third, as Ms. McLaughlin herself recognized, the cost of replacing the canopy with a company other than Birdair would necessarily be higher than Birdair's estimate, since Birdair would not share its designs and its proprietary fabric could not be used.

The Court is convinced beyond doubt, therefore, that the policy entitles SummerWind to more than $250,000.  The question is how much more. Both parties have repeatedly expressed their desire to have the Court fix a number so that they can move past this disagreement, but neither party has  presented the Court with any evidence from which it could make a reasoned decision as to an appropriate recovery between the two extremes of $250,000 and $789,700.[10]   Under these circumstances, the Court will give the parties 30 days to file a joint written report indicating how they wish to proceed before the Court enters final judgment. Perhaps they will agree upon an

---

[10]  Contrary to Harleysville's claim, the Court cannot simply use Soper's April 2003 estimate, since that was an estimate only, set forth a wide range of figures, and was premised on Soper's gaining access to Birdair's design drawings.  If anything, Soper's April 2003 estimate suggests to the Court that the replacement cost figure is more than $350,000 though considerably less than Soper's April 2004 estimate of $679,000.

36

appropriate figure consistent with this Court's opinion. Presumably, Soper's April 2004 proposal is a good baseline from which to begin those discussions,[11] although the costs that the Court has determined not to be  covered by the policy would have to be backed out of the estimate. Failing agreement, the Court urges the parties to agree to present the issue of the appropriate recovery to appraisers for a binding determination in accordance with the policy, as it has been interpreted by this Court.  If the parties are unable to agree even on a process and nevertheless insist that the Court fix the amount owing under the policy, the Court will require them to provide briefing on the appropriate disposition in view of the evidence and this Court's rulings to date.

## C.

A few odds and ends remain.

First, the Court rejects SummerWind's claim that Harleysville has not paid SummerWind the amounts required by the Extra Expense policy.  So far as the Court can determine from the record, Harleysville has paid SummerWind nearly $100,000 under the Extra Expense part of the policy. Since the Court has previously rejected SummerWind's claims regarding the band shell, it does not appear that SummerWind is owed anything further on that policy.

Second, the Court had previously taken under advisement Harleysville's motion to preclude Dr. Sazama from testifying as an expert regarding SummerWind's projected future economic losses. *See* Defendant's Motion in Limine to Preclude the Expert Testimony of Gerald Sazama [doc. # 37].

---

[11]   Soper's October 2005 proposal is not an appropriate benchmark in any case since Harleysville's policy anticipates that the building will be rebuilt or replaced within a reasonable period of time.  A reasonable period of time would be the Spring of 2004, which is consistent with the two-stage plan for permanent repair that SummerWind and Harleysville had agreed to in the summer and fall of 2003.  Harleysville cannot be blamed for any increased costs attendant to delay after April 2004.

In view of the Court's conclusion that Harleysville has not yet breached its obligations under the insurance policy and did not breach its duty of good faith and fair dealing, the Court need not address that motion, and it is therefore moot.

### III.

Accordingly, the Court DENIES as moot Defendant's Motion in Limine to Preclude the Expert Testimony of Gerald Sazama [doc. # 37].   The parties are required to file a joint written report with the Court no later than **June 2, 2006**, containing their suggestions as to how, if at all, the Court should proceed on the issue of what additional amounts are owed to SummerWind on the Harleysville building loss policy.


IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: <u>May 2, 2006</u>**.